**Kenneth P. JACOBUS; Kenneth P. Jacobus, P.C.; Wayne Anthony Ross; Ross & Miner P.C.; Scott A. Kohlhaas, Plaintiffs–Appellees,**

v.

**State of ALASKA; State of Alaska Public Offices Commission, Defendants–Appellants.**

No. 01–35666.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 4, 2002.

Filed Aug. 12, 2003.

Martin T. Schultz, Assistant Attorney General for the State of Alaska, Anchorage, AK, for the defendants-appellants.

Kenneth P. Jacobus, Anchorage, AK, for the plaintiffs-appellees.

Benjamin L. Ginsberg, Patton Boggs LLP, Washington, DC, for amicus curiae Republican National Committee.

Glenn J. Moramarco, Brennan Center for Justice at NYU School of Law, New York City, NY, for amici curiae Senators John McCain and Russell Feingold and Representatives Christopher Shays and Martin Meehan.

Brenda Wright, National Voting Rights Institute, Boston, MA, for amicus curiae National Voting Rights Institute.

Before WOOD, JR.,* D.W. NELSON, and PAEZ, Circuit Judges.

---

* The Honorable Harlington Wood, Jr., Circuit Judge for the Seventh Circuit, sitting by designation.

## OPINION

PAEZ, Circuit Judge:

In 1996, the Alaska legislature enacted sweeping reforms to its campaign finance system. Corruption and the appearance of corruption had led to low voter turnout and widespread disillusionment with the electoral system. Determined to close loopholes left open by previous attempts to establish meaningful reform, the new act restricted not only contributions to candidates, but also contributions to political parties, including "soft money." Unsurprisingly, these new restrictions have been hotly contested in both state and federal courts.

Although the term "soft money" is often used interchangeably with the phrase "not for the purpose of influencing the election or nomination of a candidate," as we hold today, political parties frequently spend soft money precisely to influence the election or nomination of a candidate. This practice creates a linguistic conundrum in which contributions that are not for the purpose of influencing elections are in fact used to influence elections. In discussing soft money throughout this opinion, we treat it as all money contributed to a political party not expressly earmarked to influence the nomination or election of a candidate.[1]

Party activists Kenneth P. Jacobus, Wayne Ross, and Scott A. Kohlhaas filed suit under 42 U.S.C. § 1983 to challenge the constitutionality of the new limitations on contributions to political parties. The district court ruled that Alaska's $5,000 limit on individual contributions and its ban on corporate and labor union contributions were unconstitutional insofar as they applied to contributions that were not for the purpose of influencing the nomination or election of particular candidates (soft money). The district court also held unconstitutional Alaska's $5,000 limit on the value of professional services that individuals might volunteer to political parties. Alaska appeals the district court's grant of summary judgment against it.

We hold that these issues are still justiciable, despite recent changes in Alaska

---

1. The distinction between "soft money" and "hard money" is widely understood to depend solely upon the designated recipient of the money, with soft money going to political parties and hard money directly to candidates. *See, e.g.,* Richard J. Baker, *Note, Constitutional Law: State Campaign Contribution Limits: Nixon v. Shrink Missouri Government PAC: An Abridgment of Freedom in the Name of Democracy,* 54 OKLA L. REV. 373, 395 n. 2 (2001) (" 'Soft money' refers to contributions to political parties from corporations, unions, special interest groups, and individuals."); *Mariani v. United States,* 212 F.3d 761, 767 (3d Cir.2000) (en banc) ("Corporations can ... make contributions to political parties in unlimited amounts ... which are referred to as 'soft money'...."). However, the terms also have a more technical meaning, created not by Congress but by the Federal Elections Commission (FEC). *See generally* Richard L. Hasen, *The Constitutionality of a Soft·Money Ban After Colorado Republican II,* 1 ELECTION LAW JOURNAL 195 (2002); *Note, Soft Money:* *The Current Rules and the Case for Reform,* 111 HARV. L. REV. 1323, 1324–28 (1998). Under the FEC's definitions, "hard money" refers to contributions spent in connection with federal candidates and thus directly regulated by the Federal Election Campaign Act (FECA), whereas "soft money" refers to money that is not directly regulated by FECA. *See id.* at 1324–25; Sean T. McLaughlin, *Pledge Our Grievance to the Flag: Could McCain Feingold Also Help Bring Young People Back to Politics?,* 27 J. LEGIS. 493, 513 n. 15 (2001); *see also United States v. Hsia,* 24 F.Supp.2d 14, 20 (D.D.C.1998) (defining soft money as "contributions for state or local campaigns and non-campaign activities such as issue advocacy"). Strictly speaking, the technical definitions do not apply at the state level because FECA does not regulate state election campaigns, and hence from the federal perspective, all money used for state elections is soft money. Perhaps as a result, Alaska's new act does not use the term soft money.

law, and we reverse the rulings of the district court holding Alaska's limitations on soft money unconstitutional. As the Supreme Court's recent opinion in *FEC v. Colorado Republican Federal Campaign Committee* (*Colorado Republican II* ), 533 U.S. 431, 121 S.Ct. 2351, 150 L.Ed.2d 461 (2001), suggests, soft money presents a danger of corruption and the appearance of corruption because political parties trade influence and access to candidates for soft money dollars, and candidates trade influence and access for the indirect benefits that they receive from soft money contributions to their party. In addition, candidates' heavy involvement in soft money fundraising and the creation of "tallying"[2] and other methods for tracking soft money contributions secured by particular candidates indicate that soft money is indeed used to circumvent hard money contribution limits. Because the limitations on soft money contributions imposed here reflect Alaska's concern about these same dangers, we uphold the limits on soft money contributions.

We affirm, however, the district court's ruling striking down as unconstitutional Alaska's limit on the value of volunteer professional services that an individual may donate to a political party. By including donations of professional services in the definition of contribution that is subjected to the $5,000 limit, Alaska restricted First Amendment association rights in a way that was different in kind, not just different in degree, from the contribution limits that the Supreme Court found constitutional in *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam). Although this provision does not operate as an absolute bar to an individu-

al's association with a party through volunteering, we nonetheless hold that Alaska failed to demonstrate that there is an actual danger or appearance of corruption if contributions of volunteer professional services go unrestricted.

## I.

### BACKGROUND

Prior to 1996, Alaska campaign finance law consisted of reporting requirements and limitations on certain expenditures and on direct contributions to candidates. 1974 Alaska Sess. Laws 76 § 1 codified at former Alaska Stat. § 15.13.010 *et seq.* Notwithstanding these restrictions, by 1996 there was considerable concern regarding actual and apparent corruption in Alaska politics, and, as concluded by the Josephson Institute in a report commissioned by the Alaska State Senate, "the level of trust and confidence in the integrity of the legislature is disturbingly low." As a result, in 1996 the Alaska legislature enacted a comprehensive reform of Alaska's campaign finance laws, Senate Bill 191, 1996 Alaska Sess. Laws 48 ("the Act"), declaring, "It is the purpose of this Act to substantially revise Alaska's election campaign finance laws in order to restore the public's trust in the electoral process and to foster good government." 1996 Alaska Sess. Laws 48 § 1(b).

As originally enacted, the Act created an interlocking system designed to restrict the influence of money on politics and prevent easy evasion of the barriers set up by the reforms. First, it banned expenditures advocating the support or defeat of a candidate by corporations, unions, and other business associations.[3] Secondly, it restricted contributions not only to candi-

---

**2.** Tallying refers to political parties' practice of keeping track of the amount of money raised for the party by each candidate, enabling the party to contribute a proportionate amount to the candidate's campaign. *See*

*Colorado Republican II*, 533 U.S. at 458–60, 121 S.Ct. 2351.

**3.** Alaska Stat. § 15.13.067 (1998); Alaska Stat. § 15.13.135 (1998).

dates, but also to political parties, political action committees ("PACs"), and other entities, banning contributions from some sources altogether[4] and placing limitations on the size of contributions from other sources.[5] The Act also regulated a number of more minor aspects of campaign finance, restricting the timing of contributions;[6] preventing candidates from putting campaign funds to certain uses;[7] and erecting various penalties for violations of campaign finance law.[8]

Most significant for purposes of this appeal were the Act's restrictions on donations to political parties, which limited contributions from individuals to not more than $5,000 per year, Alaska Stat. § 15.13.070(b)(2) (1998) (amended 2002), and banned contributions by corporations, business associations, and unions, Alaska Stat. § 15.13.074(f) (1998).[9] The Act did not explicitly condition the limitation or prohibition on contributions to political parties upon the use to which the political party intended to put the contribution. Additionally, the Act also limited the extent to which individuals could volunteer professional services for which they would ordinarily be paid, treating such volunteer activity as a contribution subject to the limitation on the monetary value of contributions. Alaska Stat. § 15.13.400(3) (1998) (amended 2002).[10]

In 1997, major aspects of the Act were challenged in Alaska state court, eventually reaching the Alaska Supreme Court. In *State v. Alaska Civil Liberties Union (Ak-CLU)*, the Alaska Supreme Court issued a

4. *E.g.*, Alaska Stat. § 15.13.074(f) (1998) (prohibiting contributions from unions or corporations); Alaska Stat. § 15.13.072 (1998) (limiting out-of-state contributions generally and prohibiting contributions from out-of-state groups); Alaska Stat. § 15.13.074(g) (1998) (banning contributions from registered lobbyists outside the district in which the lobbyist votes); Alaska Stat. § 05.15.150(a)(3) (1998) (limiting contributions raised through charitable gaming).

5. *E.g.*, Alaska Stat. § 15.13.070(b) (1998) (amended 2002) (allowing individuals to contribute up to $500 per year to a candidate and $5,000 per year to a political party); Alaska Stat. § 15.13.070(c) (1998) (allowing a group to contribute up to $1,000 per year to a candidate, another group, or a political party); Alaska Stat. § 15.13.070(d) (1998) (imposing a cap upon the amount a political party can contribute to a candidate, the amount of which varies depending upon the office in question).

6. Alaska Stat. § 15.13.074(c) (1998).

7. Alaska Stat. § 15.13.116 (1998); Alaska Stat. § 15.13.112(b)(7) (1998); Alaska Stat. § 15.13.078 (1998).

8. *E.g.*, Alaska Stat. § 15.13.125 (1998); Alaska Stat. § 15.56.012 (1998); Alaska Stat. § 15.56.014 (1998); Alaska Stat. § 15.56.016 (1998).

9. Section 15.13.074(f) of the Alaska Statutes prohibits corporations and other business associations from contributing to a candidate or group unless they satisfy the definition of "group" in section 15.13.400. Political parties and candidate election committees are included in the definition of "group," and consequently are permitted to contribute to candidates and groups to the extent permitted by other provisions of the Act. Alaska Stat. § 15.13.400(8) (2003) (formerly located at section 15.13.400(5) (1998)).

10. "Contribution" included in relevant part "a purchase, payment ... or gift of money, goods or services ... that.is made for the purpose of influencing the nomination or election of a candidate,[or] ... for the purpose of influencing a ballot proposition or question." Alaska Stat. § 15.13.400(3) (1998). "Contribution" excluded most volunteer services, but explicitly included "professional services volunteered by individuals for which they ordinarily would be paid a fee or wage." Alaska Stat. § 15.13.400(3)(B) (1998). This provision has been amended and is now available at section 15.13.400(4) of the Alaska Statutes.

compendious opinion interpreting the Act. 978 P.2d 597 (Alaska 1999). The court found most provisions of the Act to be constitutional, upholding both the Act's ban on corporate expenditures relating to candidate elections, *id.* at 608–10, and its limits on individual contributions and prohibition on corporate contributions to parties and candidates, *id.* at 614, 620–25. The issue of soft money contributions was not raised before the court.

This suit involves a much narrower challenge, focusing on provisions of the Act that regulate contributions to political parties. The plaintiffs in this action are lawyers and party activists who regularly volunteer their services to specific political parties, and law firms wholly owned by the individual plaintiffs (jointly "Jacobus" or "Plaintiffs"). Jacobus brought this suit against the State of Alaska and the Alaska Public Offices Commission (together "Alaska"), challenging two aspects of the Act. First, he claimed that the Act did not limit, or, in the alternative, that it could not constitutionally limit, either individual or corporate soft money contributions to political parties. Secondly, Jacobus challenged the inclusion of volunteer professional services in the definition of contribution, which subjected such volunteer services to the $5,000 limit on individual contributions and the prohibition on corporate contributions.

Jacobus initiated this suit in 1997, but the district court stayed the case pending the outcome of *AkCLU*.[11] The stay was lifted in 2000, after the United States Supreme Court denied certiorari in *AkCLU*. 528 U.S. 1153, 120 S.Ct. 1156, 145 L.Ed.2d 1069 (2000). Thereafter, both sides moved for summary judgment.

The district court granted summary judgment for Jacobus. In its first order, issued April 10, 2001, the district court found that Alaska's restrictions on contributions to political parties donated by individuals were unconstitutional to the extent that they limited donations made to a political party "for a purpose other than influencing the nomination or election of a candidate."[12] *Jacobus v. Alaska*, 182 F.Supp.2d 881, 893 (D.Alaska 2001); *see also id.* at 889. In other words, while Alaska could restrict contributions to parties to a certain extent, it could not limit contributions of soft money. The district court also found that the Act's limitation on the provision of volunteer professional services was unconstitutional. *Id.* at 892.

The court initially upheld the ban on corporate contributions to candidates and political parties in its entirety. *Id.* at 892–93. But in response to Jacobus's motion to amend or clarify the judgment, the district court issued an amended order on June 6, 2001. *Jacobus v. Alaska*, 182 F.Supp.2d 893 (D.Alaska 2001). In this second order, the district court determined that, like the limit on individual contributions to parties, the ban on corporate contributions was also unconstitutional to the extent that it prohibited soft money contributions. *Id.* at 895–97.

Alaska timely appealed the amended judgment.[13] After this case was briefed,

---

**11.** Prior to issuance of the stay, Jacobus had moved for a preliminary injunction barring enforcement of the Act on October 28, 1997, which the district court denied the next day. Jacobus appealed the denial of the preliminary injunction to this court, and we affirmed the district court in a memorandum disposition. *Jacobus v. Alaska*, 141 F.3d 1176, 1998 WL 84343 (9th Cir.1998) (Table, text in Westlaw).

**12.** In summarizing its holding, the district court appears to have accidentally referred to former section 15.13.400(3) of the Alaska Statutes as section 15.30.400(3). 182 F.Supp.2d at 893.

**13.** The National Voting Rights Institute has filed an amicus brief in this case, urging reversal of the district court's ruling regarding soft money contribution limits, as have United

the Alaska Legislature revised the campaign finance law under scrutiny in ways significant to this case. 2002 Alaska Sess. Laws 3. The limitation on the value of contributions from individuals to political parties was altered in accordance with the district court's first ruling, thus removing the limits on soft money contributions by individuals.[14] 2002 Alaska Sess. Laws 3 § 2 (amending Alaska Stat. § 15.13.070(b)(2)). Additionally, the Act was amended so that volunteer professional services are no longer included in the definition of contribution, and hence are no longer subject to limitation. Alaska Stat. § 15.13.400(4)(B)(i) (2003). However, the ban on corporate contributions to political parties and other groups remains unaltered. Alaska Stat. § 15.13.074(f) (2003).

Thus, we must decide three questions. First, is the present challenge to Alaska's now-repealed *limitation on soft money contributions* to political parties *from individuals* justiciable, and if so, is it constitutional? Second, is a *ban on soft money contributions* to political parties *from corporations* constitutional? Third, is the challenge to Alaska's now-repealed restriction on the provision of volunteer professional services justiciable, and if so, is the provision constitutional?

## II.

### JUSTICIABILITY

We first address the question of whether, in light of the Alaska Legislature's repeal of two out of the three challenged provisions of the Act, this action is moot with regard to these provisions. A case is moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Clark v. City of Lakewood,* 259 F.3d 996, 1011 (9th Cir.2001). " 'Past exposure to illegal conduct does not in itself show a present case or controversy ... if unaccompanied by any continuing, present adverse effects.' " *Renne v. Geary,* 501 U.S. 312, 320–21, 111 S.Ct. 2331, 115 L.Ed.2d 288 (1991) (quoting *O'Shea v. Littleton,* 414 U.S. 488, 495–96, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974)). However, dismissal of a case "on grounds of mootness would be justified only if it were absolutely clear that the litigant no longer had any need of the judicial protection that it sought." *Adarand Constructors, Inc. v. Slater,* 528 U.S. 216, 224, 120 S.Ct. 722, 145 L.Ed.2d 650

States Senators John McCain and Russell Feingold and United States Representatives Christopher Shays and Martin Meehan. The Republican National Committee has filed an amicus brief urging affirmance.

**14.** We pause to note that the phrase "for the purpose of influencing the nomination or election of a candidate" has engendered a certain amount of confusion in this matter. The district court first declared that the Alaska Public Offices Commission (APOC) reasonably interpreted this phrase to encompass all contributions to a political party (including soft money), 182 F.Supp.2d at 885–86, but subsequently used the same phrase in order to exclude soft money from regulation, *id.* at 889. The Alaska Legislature then amended the Act in response to the district court's order, adding this phrase to section 15.13.070(b)(2) of the Alaska Statutes. In doing so, it clearly intended to comply with the ruling of the district court. *See* Rules Committee Minutes Nos. 0013, 0064, 0130 (April 19, 2001) *at* http://old-www.legis.state.ak.us/cgi-bin/folioisa.dll/cm22/query= !22sb + 103!22 + !26 + 0005/ doc/ [@3951]?. However, elsewhere in the Act this same phrase is used to include soft money. Alaska Stat. § 15.13.400(4) (2003) (formerly at section 15.13.400(3) of the Alaska Statutes). As the Supreme Court has noted, the phrase in question is inherently ambiguous. *See Buckley,* 424 U.S. at 77, 96 S.Ct. 612 (discussing "the ambiguity of this phrase"). Because, as the above discussion reveals, the notion of when a contribution is for the purpose of influencing an election is both hazy and crucial, we explore this concept without relying upon this language.

(2000). The Supreme Court has emphasized that the doctrine of mootness is more flexible than other strands of justiciability doctrine. In *Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.*, the Court stated that "there are circumstances in which the prospect that a defendant will engage in (or resume) harmful conduct may be too speculative to support standing [at the time the case is brought], but not too speculative to overcome mootness." 528 U.S. 167, 190, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000). The Court explained the practical reasons behind the flexibility of the mootness doctrine: "[B]y the time mootness is an issue, the case has been brought and litigated, often (as here) for years. To abandon the case at an advanced stage may prove more wasteful than frugal." *Id.* at 191–92, 120 S.Ct. 693.

▮ Our circuit, perhaps following the lead of the Supreme Court, has issued somewhat confused pronouncements regarding mootness generally, and mootness in the context of repealed or amended statutes in particular. Thus, we have stated " 'if a challenged law is repealed or expires, the case becomes moot.' " *Smith v. Univ. of Washington*, 233 F.3d 1188, 1195 (9th Cir.2000) (quoting *Native Vill. of Noatak v.Blatchford*, 38 F.3d 1505, 1510 (9th Cir.1994)); *see also Barilla v. Ervin*, 886 F.2d 1514, 1521 (9th Cir.1989), *overruled on other grounds by Simpson v. Lear Astronics Corp.*, 77 F.3d 1170, 1174 (9th Cir. 1996). However, we have also decreed that in cases involving the amendment or repeal of a statute, "mootness ... is not a jurisdictional issue; rather, we may continue to exercise authority over a purportedly moot case where the balance of interests favors such continued authority." *Coral Constr. Co. v. King County*, 941 F.2d 910, 927 (9th Cir.1991). As we have explained, "repeal of the objectionable language [does] not deprive the federal courts of jurisdiction to decide the constitutional question because of the well-settled princi-

ple that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *Carreras v. City of Anaheim*, 768 F.2d 1039, 1047 (9th Cir. 1985) (internal quotation marks omitted); *see also City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289, 102 S.Ct. 1070, 71 L.Ed.2d 152 (1982) ("[Revision of a statute] is a matter relating to the *exercise* rather than the *existence* of judicial power." (emphasis added)); *id.* at 289 n. 10, 102 S.Ct. 1070 ("Mere voluntary cessation of allegedly illegal conduct does not moot a case; if it did, the courts would be compelled to leave the defendant free to return to his old ways." (alterations and internal quotation marks omitted) (quoting *United States v. Concentrated Phosphate Exp. Ass'n.*, 393 U.S. 199, 203–04, 89 S.Ct. 361, 21 L.Ed.2d 344 (1968))). These concerns are of particular force in a case like the present one, in which the "voluntary cessation" occurred only in response to the district court's judgment. *See Coral Constr.*, 941 F.2d at 928 (noting that likelihood of reenactment is a significant factor in the evaluation of mootness); *see also Smith*, 233 F.3d at 1194 (indicating that mootness is less appropriate when repeal occurred due to the "prodding effect" of litigation).

▮ Thus, although we have an independent obligation to decide whether we have jurisdiction over a case, *Clark*, 259 F.3d at 1011, mootness is not jurisdictional in cases such as this. Ordinarily, the "party moving for dismissal on mootness grounds bears a heavy burden." *Coral Constr.*, 941 F.2d at 927–28; *see also Friends of the Earth*, 528 U.S. at 190, 120 S.Ct. 693 (noting that although it is the plaintiff's affirmative burden to establish standing, "a defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is

absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur"); *Adarand Constructors*, 528 U.S. at 222, 120 S.Ct. 722 (same); *Fed. Trade Comm'n v.Affordable Media, LLC*, 179 F.3d 1228, 1238 (9th Cir.1999) (same). Because both parties maintain in supplemental briefing that the case is justiciable, this burden cannot be met.

 We need not rely upon the parties' position, however, because even if we were to hold the parties to inflexible compliance with the dictates of mootness, the matter is not moot. Despite superseding events, an issue is not moot if there are present effects that are legally significant. *Smith*, 233 F.3d at 1194 (requiring that "interim relief or events have *completely and irrevocably* eradicated the effects of the alleged violation" (emphasis added)); *see also Norman v. Reed*, 502 U.S. 279, 288, 112 S.Ct. 698, 116 L.Ed.2d 711 (1992); *Reich v. Local 396, Int'l Bhd. of Teamsters*, 97 F.3d 1269, 1272 n. 5 (9th Cir. 1996). Here, Plaintiffs will likely experience prosecution and civil penalties for their past violations of the repealed provisions of the Act. Under section 11.81.200 of the Alaska Statutes, an individual can be prosecuted for past violations of a criminal statute despite its subsequent repeal or amendment.[15] *See Galbraith v. State*, 693 P.2d 880, 881–82 (Alaska Ct.App.1985) (holding that individual was properly sentenced under law in existence at time of offense, despite subsequent amendment). Plaintiffs Jacobus and Ross have violated both the $5,000 individual contribution limit and the restriction on volunteer professional services. As a result, they are vulnerable to civil and criminal prosecution under a number of different provisions.

*See, e.g.*, Alaska Stat. § 15.13.390 (2003) (imposing civil penalties and fines for violation of the Act); Alaska Stat. § 15.56.012 (2003) (making some violations of the Act the "crime of campaign misconduct in the first degree"); Alaska Stat. § 15.56.016 (2003) (making other violations of the Act the "crime of campaign misconduct in the third degree"). Significantly, APOC sent Jacobus a letter indicating that if the law were upheld it reserved the right to prosecute any past violations, although it would not pursue any enforcement action during the pendency of the litigation. In light of the ongoing civil and criminal ramifications of Plaintiffs' past violations, the claims are not moot.

 Our justiciability inquiry does not end with the conclusion that the case is not moot. As is frequently the case, we must investigate the question of ripeness in addition to that of mootness. Because the existence of a live case or controversy is dependent upon the likelihood of future prosecution for past violations, we must explore whether the case is currently ripe for decision. The requirement of ripeness is intended to ensure that "issues presented are 'definite and concrete, not hypothetical or abstract.'" *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1139 (9th Cir.2000) (en banc) (quoting *Railway Mail Ass'n v. Corsi*, 326 U.S. 88, 93, 65 S.Ct. 1483, 89 L.Ed. 2072 (1945)).

 While a generalized possibility of prosecution does not satisfy the ripeness requirement, a genuine threat of imminent prosecution does. *City of Auburn v. Qwest Corp.*, 260 F.3d 1160, 1172–73 (9th Cir.2001); *see also Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298, 99

---

**15.** Section 11.81.200 of the Alaska Statutes states: "When all or part of a criminal statute is amended or repealed, the criminal statute or part of it so amended or repealed remains in force for the purpose of authorizing the accusation, prosecution, conviction, and punishment of a person who violated the statute or part of it before the effective date of the amending or repealing Act, unless otherwise specified in the amending or repealing Act."

S.Ct. 2301, 60 L.Ed.2d 895 (1979) ("When ... there exists a credible threat of prosecution [under a challenged statute], [a plaintiff] 'should not be required to await and undergo a criminal prosecution as the sole means of seeking relief.' "). To distinguish between the two, we have looked to three factors: 1) "whether the plaintiffs have articulated a 'concrete plan' to violate the law in question"; 2) "whether the prosecuting authorities have communicated a specific warning or threat to initiate proceedings"; and 3) "the history of past prosecution or enforcement under the challenged statute." *Thomas*, 220 F.3d at 1139. Here, each of these three factors indicates that this case is in fact ripe for review.

■ First, Plaintiffs have gone far beyond the requirement that they articulate a concrete plan to violate the law, and instead have actually engaged in the illegal behavior at issue. Secondly, while the letter sent to Jacobus does not threaten to initiate enforcement proceedings in so many words, it indicates that APOC is only awaiting the outcome of the litigation to initiate such proceedings. Finally, Alaska alleges that APOC has a general policy of seeking civil fines in response to violations of Alaska campaign finance law. *See also, e.g., Definition of Contribution and Reporting Requirements*, APOC Advisory Opinion AO97–08–CD (February 27, 1997) ("The Commission views a failure to report such information as a serious violation, and has assessed significant penalties when such activities were not reported correctly or promptly."); *Latchem v. State*, 1999 WL 587238 (Alaska Ct.App.1999) (unpublished) (affirming in part and reversing in part a defendant's criminal convictions for making campaign contributions in the name of another); *VECO Int'l, Inc. v. Alaska Pub. Offices Comm'n*, 753 P.2d 703 (Alaska 1988) (reviewing civil penalties for failure to comply with reporting requirements). Because Plaintiffs have already

violated the laws in question and it appears that they will be subjected to either criminal or civil penalties for doing so, they face "a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement" and hence the injury is not "too imaginary or speculative to support jurisdiction." *Auburn*, 260 F.3d at 1171 (internal quotation marks omitted). As the issues are purely legal and the likelihood of prosecution creates hardship to the parties, the case also satisfies the prudential aspects of ripeness, and is fit for review. *See San Diego County Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1132–33 (9th Cir.1996); *see also Thomas*, 220 F.3d at 1141–42.

### III.

### ALASKA'S REGULATION OF CONTRIBUTIONS OF SOFT MONEY

We review *de novo* the district court's grant of summary judgment. *Delta Sav. Bank v. United States*, 265 F.3d 1017, 1021 (9th Cir.2001). We agree with the district court that there are no genuine issues of material fact, *Jacobus*, 182 F.Supp.2d at 884, and thus, the only question before us is whether the district court correctly applied the relevant substantive law. *Delta Sav. Bank*, 265 F.3d at 1021.

We hold that the burden on individuals' association rights that resulted from Alaska's soft money limits was justified by the dangers of corruption and the appearance of corruption posed by large donations to political parties, and by the danger that soft money donations to parties would be used to circumvent hard money limits. Although the district court correctly concluded that the Act's contribution limits cover soft money contributions, it erred in holding that it was unconstitutional to limit such contributions.

Additionally, we uphold Alaska's prohibition on corporate soft money contributions.

Although a ban on contributions poses a more significant First Amendment burden than does a limitation, Alaska is entitled to regulate corporate participation in politics in order to prevent corporations from parlaying state-created economic advantages into advantages in political debate.

## A. STATUTORY INTERPRETATION

■ Jacobus argues that, by its terms, the Act does not regulate soft money at all. He points to the definition of contribution in the text of section 15.13.400(3)(A), which states that a contribution is a donation "that is made for the purpose of influencing the nomination or election of a candidate." In interpreting a state statute, we regard the construction rendered by the state's highest court as authoritative. *Russell v. Gregoire*, 124 F.3d 1079, 1090 (9th Cir.1997). "If there is no such decision available, then we must predict how the highest state court would decide the issue. . . ." *S.D. Myers, Inc. v. City & County of San Francisco*, 253 F.3d 461, 473 (9th Cir.2001).

Here, the Alaska Supreme Court has interpreted the Act, and has construed it to include restrictions on contributions of soft money. In *AkCLU*, the Alaska Supreme Court stated that although "federal law allows corporations and other entities to make unlimited contributions to political parties to use in general party activities," 978 P.2d at 608, "[t]he Act, by contrast, bans such contributions," *id.* at 608 n. 67. This statement was not accompanied by detailed reasoning, but it is clear and does not readily admit of alternate interpretations.[16]

■ The district court found that the Alaska Supreme Court had not considered the question of whether the Act regulated contributions for general party activities. Instead, the district court declared that, in making the statement quoted above, the Alaska Supreme Court was "simply noting the difference in the laws as they pertained to bans on [corporate] independent expenditures." *Jacobus*, 182 F.Supp.2d at 885 n. 4. We disagree with this assessment of the Alaska Supreme Court's statement.[17] Although the Alaska Supreme

---

**16.** *AkCLU* did not address the permissibility of unlimited contributions for general party activities by individuals, but APOC has interpreted the statute to prohibit these contributions as well. *See, e.g.,* APOC, *Frequently Asked Questions About the New Campaign Disclosure Law* (revised April 2002), *at* http://www.state.ak.us/apoc/faq297.htm. This interpretation is clearly reasonable, as the definition of contribution remains constant for individuals and corporations.

**17.** The district court discounted *AkCLU's* interpretation of section 15.13.074(f) of the Alaska Statutes, focusing its analysis on what the Alaska Supreme Court likely would conclude if it were directly presented with the question of whether the Act covered soft money. Were we to follow this alternative approach, we would agree with the district court that the Alaska Supreme Court's practice of deference to agency expertise would lead it to construe "contribution" to include soft money contributions. In Alaska, if "the

questions at issue implicate special agency expertise or the determination of fundamental policies within the scope of the agency's statutory function," then the courts defer to the agency's interpretation of a statute "so long as it is reasonable." *Tesoro Alaska Petroleum Co. v. Kenai Pipe Line Co.*, 746 P.2d 896, 903 (Alaska 1987). Thus, as the Alaska agency in charge of enforcing the Act, APOC's interpretation of the language in question is entitled to significant deference. The State of Alaska and APOC have interpreted "contribution" to include soft money, reasoning that all contributions to political parties are covered by section 15.13.400(3)(A)'s definition because "all actions by political parties are inherently tied to the nomination and election of candidates." *See also Definition of Contribution,* Advisory Opinion A097–98–CD ("The primary function of political parties is to further political agendas by electing candidates. For this reason, the Commission has always viewed a payment to a political party as a contribution; ultimately the payment is intended to influ-

Court's comments occurred in the course of upholding Alaska's ban on corporate expenditures, its conclusion that Alaska law does not allow unlimited contributions for general party activities describes "the difference in the laws as they pertain[ ] to" a *soft money* ban, not an *independent expenditure* ban. As the Alaska Supreme Court explained, AkCLU had argued that the expenditure ban "cannot satisfy federal law because Alaska does not permit *alternative participation* by business and labor entities[, such as] ... *contributions to political parties to use in general party activities.*" *AkCLU,* 978 P.2d at 608 (emphasis added). The Alaska Supreme Court agreed that the Act prohibited corporations from making unlimited contributions for use in general party activities. While brief, the Alaska Supreme Court's discussion constitutes a definitive statement, one that we cannot disregard.

**B. CONSTITUTIONALITY OF LIMITS ON INDIVIDUALS' SOFT MONEY CONTRIBUTIONS**

■ Having concluded that the Act's contribution limits extend to soft money contributions, we now uphold the constitutionality of these limits and reverse the district court's grant of summary judgment in favor of Jacobus.[18] In contrast to the district court, we believe that *"Buck-*

*ley's* holding seems to leave the political branches broad authority to enact laws regulating contributions that take the form of 'soft money.' " *Nixon v. Shrink Missouri Government PAC,* 528 U.S. 377, 404, 120 S.Ct. 897, 145 L.Ed.2d 886 (2000) (Breyer, J., concurring).

**1. First Amendment Principles Underlying Restrictions on Contributions of Soft Money**

Campaign finance reform presents "a case where constitutionally protected interests lie on both sides of the legal equation." *Id.* at 400, 120 S.Ct. 897 (Breyer, J., concurring). On the one hand, "[t]he First Amendment affords the broadest protection to [discussion of public issues and debate on the qualifications of candidates] in order to assure [the] unfettered interchange of ideas." *Buckley,* 424 U.S. at 14, 96 S.Ct. 612 (internal quotation marks omitted). At the same time, a failure to regulate the arena of campaign finance allows the influence of wealthy individuals and corporations to drown out the voices of individual citizens, producing a political system unresponsive to the needs and desires of the public, and causing the public to become disillusioned with and mistrustful of the political system. *See Nixon,* 528 U.S. at 390, 120 S.Ct. 897.

---

ence the outcome of an election."); *Jacobus I,* 182 F.Supp.2d at 885.

Jacobus relies upon the affidavit of Randy Ruedrich, which declares that some contributions to political parties are not for the purpose of influencing the nomination or election of a candidate, to imply that APOC's interpretation is not reasonable. This conclusory affidavit is insufficient to undermine the reasonableness of APOC's interpretation. Nor is APOC's rationale undercut by the Supreme Court's discussion in *Colorado Republican II* of the "weakness in the seemingly unexceptionable premise that parties are organized for the purpose of electing candidates." 533 U.S. 431, 450, 121 S.Ct. 2351, 150 L.Ed.2d 461 (2001). The Court made this comment in the course of emphasizing that "whether they

like it or not, [parties] act as agents for spending on behalf of those who seek to produce obligated officeholders." *Id.* at 452, 121 S.Ct. 2351. In so holding, the Court accepted the notion that the goals and activities of parties revolve around the election of candidates.

Thus, the Alaska Supreme Court would defer—and, in fact, has deferred—to APOC's reasonable interpretation of the statute.

**18.** As discussed above, the Act has been amended and so no longer limits soft money contributions by individuals. We hold that Alaska acted constitutionally in enacting the Act as it formerly existed, and that there is no bar on these grounds to Alaska's criminal or civil prosecution of Jacobus under the former Act.

In upholding the Federal Election Campaign Act's (FECA's) contribution limits in its seminal decision in *Buckley v. Valeo,* 424 U.S. 1, 23–38, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), the Supreme Court considered the nature, source and parameters of the constitutional right to contribute money in elections. The Court erected a fundamental legal and conceptual divide between contributions and expenditures, *id.* at 12–59, 96 S.Ct. 612, "[g]enerally ... uph[olding] as constitutional the limitations on *contributions to candidates* and str[iking] down as unconstitutional *limitations on independent expenditures.*" *FEC v. Nat'l Conservative Political Action Comm.,* 470 U.S. 480, 491, 105 S.Ct. 1459, 84 L.Ed.2d 455 (1985). Although the Court has since upheld expenditure restrictions in the limited context of corporations, *Austin v. Mich. Chamber of Commerce,* 494 U.S. 652, 654–55, 110 S.Ct. 1391, 108 L.Ed.2d 652 (1990), "[l]ater cases have respected this line between contributing and spending." *Colorado Republican II,* 533 U.S. at 437, 121 S.Ct. 2351 (listing cases).

In *Buckley,* the Court explained that campaign finance reform affects two different rights protected by the First Amendment: the right of expression (a speech right) and the right of association. Limitations on *contributions* affect the right of association, but unlike expenditure limits, do not primarily implicate the contributor's speech rights. Contribution limits do not significantly burden speech because the communicative content of the act of contributing is largely symbolic, and therefore is not diminished by limits on the amount of the contribution:

A limitation on the amount of money a person may give to a candidate or campaign organization thus involves little direct restraint on his political communication, for it permits the symbolic expression of support evidenced by a contribution but does not in any way infringe the contributor's freedom to discuss candidates and issues.[19]

*Buckley,* 424 U.S. at 21, 96 S.Ct. 612.

Contribution limits do, however, burden the *right of association. Id.* at 24, 96 S.Ct. 612 ("[T]he primary First Amendment problem raised by ... contribution limitations is their restriction of one aspect of the contributor's freedom of political association."). As the Court explained:

Making a contribution, like joining a political party, serves to affiliate a person with a candidate. In addition, it enables like-minded persons to pool their resources in furtherance of common political goals. The Act's contribution ceilings thus limit one important means of associating with a candidate or committee.

*Id.* at 22, 96 S.Ct. 612. The Court noted, however, that the Act's contribution limits "leave the contributor free to become a member of any political association and to assist personally in the association's efforts on behalf of candidates." *Id.*

In contrast, limitations on *expenditures* "represent substantial rather than merely theoretical restraints on the quantity and diversity of political speech" as well as association. *Id.* at 19, 96 S.Ct. 612. Because expenditure limits implicate both speech and association rights, they are subject to more rigorous restriction.

---

**19.** The Court explained at more length:
A contribution serves as a general expression of support for the candidate and his views, but does not communicate the underlying basis for the support. The quantity of communication by the contributor does not increase perceptibly with the size of his contribution, since the expression rests solely on the undifferentiated, symbolic act of contributing.
*Id.* at 21, 96 S.Ct. 612.

### 2. The Appropriate Standard for Evaluating Restrictions on Contributions of Soft Money

As a result of the foregoing analysis, the Court has indicated that the appropriate constitutional standard for limits on contributions is somewhat more relaxed than that applied to limits on expenditures. *See FEC v. Beaumont,* — U.S. ——, ——, 123 S.Ct. 2200, 2210, 156 L.Ed.2d 179 (2003) ("[R]estrictions on political contributions have been treated as merely 'marginal' speech restrictions subject to relatively complaisant review under the First Amendment...."); *Nixon,* 528 U.S. at 387, 120 S.Ct. 897 ("We have consistently held that restrictions on contributions require less compelling justification than restrictions on independent spending." (quoting *FEC v. Mass. Citizens for Life, Inc.,* 479 U.S. 238, 259–60, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986))); *Cal. Med. Ass'n v. FEC,* 453 U.S. 182, 196, 101 S.Ct. 2712, 69 L.Ed.2d 567 (1981). Although freedom of association is a fundamental right, it is not absolute. *See, e.g., Buckley,* 424 U.S. at 25, 96 S.Ct. 612. Thus, the standard applied by the Court in assessing the constitutionality of contribution limits established that "[e]ven a 'significant interference with protected rights of political association' may be sustained if the State demonstrates a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgment of associational freedoms." *Id.* (quoting *Cousins v. Wigoda,* 419 U.S. 477, 488, 95 S.Ct. 541, 42 L.Ed.2d 595 (1975)) (some internal quotation marks omitted).

The Court has applied this standard in every case in which it has considered restrictions on contributions. *See, e.g., Beaumont,* — U.S. at ——, 123 S.Ct. at 2210; *Colorado Republican II,* 533 U.S. at 456, 121 S.Ct. 2351; *Nixon,* 528 U.S. at 387–88, 120 S.Ct. 897; *Buckley,* 424 U.S. 1, 96 S.Ct. 612. In fact, in *Colorado Republican II* the Court specifically rejected the contention that party contributions merited a stricter standard of scrutiny, concluding that "[w]e accordingly apply to a party's coordinated spending limitation same scrutiny we have applied to the other political actors, that is, scrutiny appropriate for a contribution limit." 533 U.S. at 456, 121 S.Ct. 2351; *see also McConnell v. FEC,* No. 02–582, slip op. by Leon, J., at 13–15 (D.D.C. 3–judge court 2003) (stating the holding of the court); *id.,* slip op. by Kollar–Kotelly, J., at 489–90; *but see id.,* slip op. by Henderson, J., at 258–59.[20] Nonetheless, Jacobus challenges this standard as applied to contributions of soft money, because limits on soft money limit the parties' speech, and therefore the parties' ability "to function and grow." [21]

---

**20.** In passing the McCain–Feingold bill, Congress enacted amendments to FECA that were both significant and controversial. *See* Bipartisan Campaign Reform Act of 2002, Pub.L. No. 107–155, 116 Stat. 81 (2002). To expedite anticipated challenges to the bill, Congress provided for review by a three-judge district court, consisting of two district judges and one circuit judge. The three-judge *McConnell* court addressed the constitutionality of the bill's ban on soft money contributions to political parties. The court issued a highly-fractured, 1700–page opinion, which not only involved each judge writing separately and making separate factual findings, but also included a per curiam opinion. Although the court's analyses provide some help in considering the constitutionality of a soft money ban, and we are in agreement with the shifting majority with regard to several areas, our analysis focuses upon the Supreme Court's jurisprudence.

**21.** In *Beaumont,* the Court spelled out "the basic premise we have followed in setting First Amendment standards for reviewing political financial restrictions: the level of scrutiny is based on the importance of the 'political activity at issue' to effective speech or political association." — U.S. at ——, 123 S.Ct. at 2210. The Court then reiterated the strict standard used for reviewing expendi-

This argument is foreclosed by *Buckley*. *Buckley* acknowledged the effect of contribution limits on the speech rights of the donee, as opposed to the contributor, noting that "contributions may result in political expression if spent by a candidate or an association to present views to the voters," but "the transformation of contributions into political debate involves speech by someone other than the contributor." 424 U.S. at 21, 96 S.Ct. 612. The fact that some contributions ultimately are used for political speech did not convince the Court that contribution limits implicate speech rights significantly: the Court did not see any real danger that contribution limits would "reduce the total amount of money potentially available to promote political expression," because "[t]he overall effect of [ ] contribution ceilings is merely to require candidates and political committees to raise funds from a greater number of persons and to compel people who would otherwise contribute amounts greater than the statutory limits to expend such funds on direct political expression." *Id.* at 22–23, 96 S.Ct. 612. The Court deemed the donee's speech rights adequately protected as long as limits are not so severe as to prevent candidates and political commit-

tees from "amassing the resources necessary for effective advocacy." *Id.* at 21, 96 S.Ct. 612.

Jacobus has wholly failed to explain why this framework does not apply here. Thus, limitations on contributions of soft money will be sustained as long as the state demonstrates a sufficiently important governmental interest and the limits employed are closely tailored to achieve that interest.

### 3. Sufficiently Important Government Interests

As the following discussion establishes, preventing corruption, avoiding the appearance of corruption, and averting the circumvention of provisions intended to combat corruption are sufficiently important governmental interests to justify Alaska's former limits on soft money contributions. There is ample support for this conclusion in both recent case law and in the practical realities of modern party fundraising.

Despite criticism in the literature and by some courts,[22] the only interests that the Court has thus far found sufficiently important to justify limits on contributions have been those related to the danger of corruption.[23] *See FEC v. Nat'l Conserva-*

tures and the more lax standard for contributions, explaining that although other considerations should not be ignored, "it is just that the time to consider [such issues] is when applying scrutiny at the level selected, not in selecting the standard of review itself." *Id.* at 2211.

**22.** *See, e.g.,* Stephanie Pestorich Manson, *When Money Talks: Reconciling Buckley, the First Amendment, and Campaign Finance Reform,* 58 WASH. & LEE L. REV. 1109, 1149–54 (2001) (mentioning the importance of "a more general interest in protecting the integrity of elections" and noting the interest in equalizing speakers economically); *cf. Homans v. City of Albuquerque,* 264 F.3d 1240, 1242–43, 1244 (10th Cir.2001).

**23.** In *Buckley,* the Court did not find it necessary to reach the question of whether the

interests in "equaliz[ing] the relative ability of all citizens to affect the outcome of elections" or restraining "the skyrocketing cost of political campaigns and thereby serv[ing] to open the political system more widely to candidates without access to sources of large amounts of money" were sufficient to justify contribution limits. 424 U.S. at 25–26, 96 S.Ct. 612. However, the Court resoundingly rejected the sufficiency of these interests in the context of limitations on expenditures. *Id.* at 49, 54, 96 S.Ct. 612.

The Court has recognized additional interests in upholding other aspects of campaign finance reform. The Court viewed three interests as vindicated by disclosure requirements: 1) "provid[ing] the electorate with information ... to aid the voters in evaluating" candidates; 2) deterring corruption and the appearance of corruption; and 3) "gath-

*tive Political Action Comm.*, 470 U.S. at 496–97, 105 S.Ct. 1459 ("We held in *Buckley* and reaffirmed in *Citizens Against Rent Control* that preventing corruption or the appearance of corruption are [sic] the only legitimate and compelling government interests thus far identified for restricting campaign finances.").

The Court originally emphasized the quid pro quo aspect of corruption. *See, e.g., id.* at 497, 105 S.Ct. 1459 ("Corruption is a subversion of the political process. Elected officials are influenced to act contrary to their obligations of office by the prospect of financial gain to themselves or infusions of money into their campaigns."); *Buckley*, 424 U.S. at 26–27, 96 S.Ct. 612 (explaining that because contributions are necessary to conduct a successful campaign, "[t]o the extent that large contributions are given to secure a political quid pro quo from current and potential office holders, the integrity of our system of representative democracy is undermined"). However, the Court's definition of corruption has since expanded to include more subtle and insidious types of inappropriate influence. Thus, the Court subsequently explained that "[i]n speaking [in *Buckley*] of 'improper influence' and 'opportunities for abuse' in addition to 'quid pro quo arrangements,' we recognized a concern not confined to bribery of public officials, but extending to the broader threat from politicians too compliant with the wishes of large contributors." *Nixon*, 528 U.S. at 389, 120 S.Ct. 897; *see also Colorado Republican II*, 533 U.S. at 441, 121 S.Ct. 2351 (defining corruption broadly as "not only [ ] *quid pro quo* agreements, but also undue influence on an officeholder's judgment").

The Court has recognized three means by which the danger of corruption can have a destructive impact on the political system. First, corruption itself undermines democracy when political victories occur not because of the wishes of the public or the independent judgment of the people's elected representatives, but because of the influence of money. *Nixon*, 528 U.S. at 389, 120 S.Ct. 897; *Buckley*, 424 U.S. at 26–27, 96 S.Ct. 612. Second, the appearance of corruption may cause "confidence in the system of representative Government ... to be eroded to a disastrous extent." *Nixon*, 528 U.S. at 389, 120 S.Ct. 897 (quoting *Buckley*, 424 U.S. at 27, 96 S.Ct. 612); *see also id.* at 388, 120 S.Ct. 897 (noting further that the "impact of the appearance of corruption stemming from public awareness of the opportunities for abuse inherent in a regime of large individual financial contributions" is "[o]f almost equal concern" to corruption itself). The Court cautioned:

> Leave the perception of impropriety unanswered, and the cynical assumption that large donors call the tune could jeopardize the willingness of voters to take part in democratic governance. Democracy works "only if the people have faith in those who govern, and that faith is bound to be shattered when high officials and their appointees engage in activities which arouse suspicions of malfeasance and corruption."

*Id.* at 390, 120 S.Ct. 897 (quoting *United States v. Miss. Valley Generating Co.*, 364 U.S. 520, 562, 81 S.Ct. 294, 5 L.Ed.2d 268 (1961)). Third, and most recently, the Court has also recognized that "circumvention is a valid theory of corruption." *Colorado Republican II*, 533 U.S. at 456, 121 S.Ct. 2351; *see also Cal. Med. Ass'n*, 453

---

ering the data necessary to detect violations of contribution limitations." *Id.* at 66–68, 96 S.Ct. 612. In *Austin*, the Court also recognized the sufficiency of the interest in restrict-

ing the ability of corporate wealth to unfairly influence elections. 494 U.S. at 659–60, 110 S.Ct. 1391.

U.S. at 199, 101 S.Ct. 2712 ("[I]t is clear that this [anti-circumvention] provision is an appropriate means by which Congress could seek to protect the integrity of the contribution restrictions upheld by this Court in *Buckley.*").

Thus, Alaska can establish a sufficiently important governmental interest if it is able to show that any one of the three theories of corruption identified by the Court is implicated by the unrestricted flow of soft money contributions. The Supreme Court in *Colorado Republican II* was not faced with the issue of the constitutionality of soft money limitations. Nonetheless, by recognizing that political parties serve as a conduit from contributors to candidates, the Court effectively resolved the question of whether corruption constitutes a sufficiently important governmental interest in the context of the regulation of soft money. There is no reason to expect that the dangers described in *Colorado Republican II* will be avoided simply because powerful donors are making soft money contributions to parties, rather than parties contributing to candidates.

While our conclusion that soft money poses a significant danger of corruption is explained in more depth immediately below, we note that it is supported by the fact that the Supreme Court has consistently interpreted campaign finance law with an eye toward the actual functioning of the system of campaign finance. *See Colorado Republican II,* 533 U.S. at 443, 121 S.Ct. 2351 ("Congress drew a functional, not a formal, line between contributions and expenditures"); *see also id.* at 438, 450–52, 452 n. 14, 121 S.Ct. 2351; *Buckley,* 424 U.S. at 46–47, 96 S.Ct. 612. Likewise, the genesis of Alaska's Act was the failure of its original, more formalistic, finance reform laws to counter corruption and the

appearance of corruption. As APOC has recognized through its advisory opinions, regulations, and in the course of this litigation, the Act similarly mandates a functional rather than formal approach to campaign finance reform.

*a) Preventing Corruption and the Appearance of Corruption*

In light of modern campaign practices, it is not necessary that money funneled through political parties be specifically designated for the election or nomination of a candidate to have a corrupting influence. *Colorado Republican II* offers a compelling account of the danger of corruption inherent in unlimited soft money contributions to parties, one that accounts for "how the power of money actually works in the political structure." 533 U.S. at 450, 121 S.Ct. 2351. Parties centralize fundraising for a broad set of candidates and programs, and therefore act as magnets for special interest groups who are looking for the most efficient ways to "advanc[e] their narrow interests." *Id.* at 451, 121 S.Ct. 2351 (alteration marks omitted).

> [M]any PACs ... contribut[e] to both parties during the same electoral cycle, and sometimes even directly to two competing candidates in the same election. Parties are thus necessarily the instruments of some contributors whose object is not to support the party's message or to elect party candidates across the board, but rather to support a specific candidate for the sake of a position on one narrow issue, or even to support any candidate who will be obliged to the contributors.

*Id.* at 451–52, 121 S.Ct. 2351 (footnotes and citation omitted). Such practices lead to two types of inappropriate influence by large soft money contributors.[24]

---

24. In addressing the government's interest in preventing corruption in the context of a soft money ban, the three-judge *McConnell* court

First, such contributions create the danger that the parties themselves will become beholden to special interests. As the Supreme Court noted in *Colorado Republican II*, these obligations are of concern because of the parties' unique ability to reward major benefactors with access to lawmakers and candidates: "the record shows that even under present law substantial donations turn the parties into matchmakers whose special meetings and receptions give the donors the chance to get their points across to the candidates." 533 U.S. at 461, 121 S.Ct. 2351; *see also id.* at 461 n. 25, 121 S.Ct. 2351; *Mariani v. United States,* 212 F.3d 761, 768 (3d Cir. 2000) (en banc) ("Large and repeat donors sometime [sic] get more access than other donors, and donating soft money can be a more effective means for getting access than hard money."). Like direct influence-peddling by candidates, this kind of access-peddling creates a danger of corruption and the appearance of corruption.

Second, candidates and officeholders who are party members may become directly beholden to the party's donors, even if the benefit that they receive from a large donation to the party is indirect. Contributing to parties is an extremely efficient way for a special interest group "to produce obligated officeholders," because it allows such a group to obligate anyone and everyone in a political party, rather than limiting its influence to specific candidates. *Colorado Republican II,* 533 U.S. at 452, 121 S.Ct. 2351. Candidates and officeholders are likely to feel obligated to major party donors because they are already beholden to the party as a result of the benefits that flow from party membership. *See Colorado Republican I,* 518 U.S. at 648, 116 S.Ct. 2309 (Stevens, J., dissenting) ("A party shares a unique relationship with the candidate it sponsors because their political fates are inextricably linked. That interdependency creates a special danger that the party—or the persons that control the party—will abuse the influence it has over the candidate by virtue of its power to spend."). The Court in *Colorado Republican II* even noted that influence within the party itself was a significant benefit for which candidates and officeholders might be willing to trade influence over the legislative process. *See* 533 U.S. at 460 n. 23, 121 S.Ct. 2351.

As *Colorado Republican II* recognized, special interests contribute to candidates competing against each other in the same

split three ways. Judge Henderson was not convinced that soft money presented an actual or apparent threat of corruption, and did not believe that the ban enacted would alleviate any such threat. Slip op. by Henderson, J., at 270–72, 275–79. Judge Kollar–Kotelly found abundant evidence that all forms of soft money provided a donor with increased access to candidates and politicians, enabling circumvention of contribution limits and creating an appearance of corruption. Slip op. by Kollar–Kotelly, J., at 496, 505, 525, 553, 574. Because Judge Leon agreed in part with the outcome advocated by each of the other two judges, his analysis dictated the judgment of the court. Slip op., per curiam, at 6, 12. Judge Leon found that money that was clearly tied to candidacies, including sham issue ads, presented a genuine threat of corruption or the appearance of corruption. Slip op. by Leon, J., at 17–26. However, he determined that money spent for genuine issue advocacy or generic voter registration efforts could not pose a risk of corruption or its appearance, because such threats exist only where a donor confers a benefit upon a candidate, and any benefits derived from this type of soft money contributions were too attenuated. *Id.* at 26–37. As is apparent from our holding, we disagree with Judge Leon's conclusion. We do not believe that the public does (or could) track the ultimate destination of soft money contributions given to political parties, and so we conclude that large contributions create a significant appearance of corruption regardless of their ultimate use. Moreover, as we describe below, party structure makes both parties and candidates unduly solicitous of large donors, which implicates the concerns regarding corruption at issue here.

election "because they want favors" from whomever is elected. 533 U.S. at 451 n. 12, 121 S.Ct. 2351; *see also id.* at 451–52 & nn. 13, 14, 121 S.Ct. 2351. Because a modern election campaign simply cannot be conducted without significant sums of money, candidates become beholden to the sources of any contributions that aid their campaign, whether given directly or indirectly.[25] *See Buckley,* 424 U.S. at 26, 96 S.Ct. 612 ("The increasing importance of the communications media and sophisticated mass-mailing and polling operations to effective campaigning make the raising of large sums of money an ever more essential ingredient of an effective candidacy."). The Alaska Legislature focused on this issue in passing the Act, finding that "organized special interests are responsible for raising a significant portion of all election campaign funds and may thereby gain an undue influence over election campaigns and elected officials." 1996 Alaska Sess. Laws 48 § 1(a)(3).

Amicus curiae Republican National Committee notes that some political parties have functions other than simply electing candidates to office. Although this position is contrary to that taken by its state affiliates in previous litigation, *see, e.g., Colorado Republican I & II,* it may well be accurate. However, *even where* contributions to a political party are expressly earmarked for the purpose of administrative costs or off-year issue advocacy, and *even if* political parties do not use donations for these purposes to shift funds into election campaigns, the *perception of corruption* decried by the Supreme Court may still persist when contributors provide large sums of money to political parties, regardless of the purpose and ultimate use of the funds. As noted above, this percep-

tion of corruption was a matter of particular concern to Alaska legislators in enacting the Act. 1996 Alaska Sess. Laws 48 § 1(b).

*b) Preventing Circumvention of Hard Money Limits*

In *Colorado Republican II,* the Supreme Court recognized a closely-related additional governmental interest that might justify contribution limits—the interest in preventing "circumvention of contribution limits designed to combat the corrupting influence of large contributions to candidates." 533 U.S. at 456 n. 18, 121 S.Ct. 2351; *see also id.* at 456, 121 S.Ct. 2351; *Beaumont,* —— U.S. at ——, 123 S.Ct. at 2207 ("[R]ecent cases have recognized that restricting contributions by various organizations hedges against their use as conduits for 'circumvention of [valid] contribution limits.'" (quoting *Colorado Republican II,* 533 U.S. at 456 & n. 18, 121 S.Ct. 2351) (second alteration in original)); *Cal. Med. Ass'n,* 453 U.S. at 197–99, 101 S.Ct. 2712 (holding that limits on contributions to multicandidate committees are "an appropriate means by which Congress could seek to protect the integrity of the contribution restrictions upheld by this Court in *Buckley* "); *Buckley,* 424 U.S. at 35–36, 38, 96 S.Ct. 612.

As the Supreme Court found in *Colorado Republican II,* faced with federal limits on direct contributions to candidates, powerful donors have used "contributions to a party . . . as a funnel from donors to candidates." 533 U.S. at 461, 121 S.Ct. 2351. This response shows how soft money contributions are used to circumvent contribution limits.

---

**25.** If there were no chance that an officeholder would feel obligated to contributors unless their contributions *actually* had a direct effect on election or nomination, then the danger of

corruption or the appearance of corruption would not justify contribution limits on special interests that give to competing candidates, a plainly irrational outcome.

Under [FECA], a donor is limited to $2,000 in contributions to one candidate in a given election cycle. The same donor may give as much as another $20,000 each year to a national party committee supporting the candidate. What a realist would expect to occur has occurred. Donors give to the party with the tacit understanding that the favored candidate will benefit.

*Id.* at 458, 121 S.Ct. 2351. This practice is so common, the Court went on to note, that "[a]lthough the understanding between donor and party may involve no definite commitment and may be tacit on the donor's part," the National Democratic Party has developed a "manner of informal bookkeeping" known as "tallying" to ensure that the amount of money that a candidate receives from the party corresponds to the amount that the candidate raised for the party. *Id.* at 459, 121 S.Ct. 2351. The theory that soft money contributions are a means of circumventing limits on contributions to candidates is bolstered by the extensive role that candidates play in party fundraising.[26]

Many of the "party-building" activities claimed by Jacobus to be unrelated to electing candidates are easily targeted to a particular candidate, such as the promotion of a Get Out the Vote initiative in a candidate's district, or sponsorship of a legislative initiative that a candidate has made part of his or her campaign platform. Thus, these activities provide a low effort, low-risk way to circumvent contribution limits. *See Republican Party v. Pauly*, 63 F.Supp.2d at 1016 ("The [Republican Party of Minnesota] often provided administrative and strategic support to the candi-

dates. The party coordinated candidate appearances and voter registration drives, and helped to recruit volunteer assistance.").

In sum, "parties . . . function for the benefit of donors whose object is to place candidates under obligation." *Colorado Republican II*, 533 U.S. at 455, 121 S.Ct. 2351. Prevention of the corruption and appearance of corruption that result from this inescapable reality is a sufficiently important governmental interest to support limiting soft money contributions.

### 4. Close Tailoring

▌ Jacobus argues that even if Alaska has established a sufficiently important interest in limiting soft money contributions, the Act is not closely tailored to serve the State's purpose. In the context of contribution limits, the requirement of "close tailoring" does not require "the least restrictive alternative." *See, e.g., Cal. Med. Ass'n*, 453 U.S. at 199 n. 20, 101 S.Ct. 2712 ("Congress was not required to select the least restrictive means of protecting the integrity of its legislative scheme."). Indeed, the Supreme Court has stated that courts must not "second guess a legislative determination as to the need for prophylactic measures where corruption is the evil feared." *FEC v. Nat'l Right to Work Comm.*, 459 U.S. 197, 210, 103 S.Ct. 552, 74 L.Ed.2d 364 (1982).

#### a) Overbreadth

Jacobus argues that limits on soft money contributions are overbroad because not all of these contributions will be spent in ways

---

**26.** The court in *Republican Party v. Pauly* recognized this truth when it stated:

> By appearing at a RPM fund-raising event, one could argue that a candidate is, at least constructively, entering into a situation with *quid pro quo* potential. The mere fact that the candidate solicits a check made out

to 'The Republican Party of Minnesota' does not eliminate the role he played in soliciting the funds—funds which may in turn be spent by the party on behalf of his campaign.

63 F.Supp.2d 1008, 1016 (D.Minn.1999).

that benefit the candidates, either directly or indirectly, and thus, we should not assume that they will create a danger of quid pro quo corruption. The Supreme Court dismissed a similar argument in *Buckley,* declaring that "[n]ot only is it difficult to isolate suspect contributions, but, more importantly, Congress was justified in concluding that the interest in safeguarding against the appearance of impropriety requires that the opportunity for abuse inherent in the process of raising large monetary contributions be eliminated." 424 U.S. at 30, 96 S.Ct. 612. More recently, the Court has also emphasized the breadth of response justified to avoid circumvention of direct contribution limits. In *Colorado Republican II,* the Republican Party suggested that a better alternative to limiting coordinated expenditures by parties could be found in the FECA provision that treated contributions to parties as contributions to the candidate if they were "in any way earmarked or otherwise directed through an intermediary or conduit to[a] candidate." 533 U.S. at 462, 121 S.Ct. 2351. The Court rejected this proposal, stating that it "ignores the practical difficulty of identifying and directly combating circumvention under actual political conditions." *Id.* It elaborated upon this difficulty as follows:

> Donations are made to a party by contributors who favor the party's candidates in races that affect them; donors are (of course) permitted to express their views and preferences to party officials; and the party is permitted (as we have held that it must be) to spend money in its own right. When this is the environment for *contributions going into a general party treasury,* and candidate-fundraisers are rewarded with something less obvious than dollar-for-dollar pass-throughs (distributed through contributions and *party spending*), circumvention is obviously very hard to trace.

*Id.* (emphasis added). The Court explained that the earmarking provision

> would only reach the most clumsy attempts to pass contributions through to candidates. To treat the earmarking provision as the outer limit of acceptable tailoring would disarm any serious effort to limit the corrosive effects of ... " 'understandings' regarding what donors give what amounts to the party, which candidates are to receive what funds from the party, and what interests particular donors are seeking to promote."

*Id.* (quoting *FEC v. Colorado Republican Fed. Campaign Comm.,* 213 F.3d 1221, 1241 (10th Cir.2000) (Seymour, Chief Judge, dissenting)). The district court's judgment here reduces the Act to little more than an earmarking scheme, which suffers from the same limitations identified by the Supreme Court.

In fact, *Colorado Republican II* strongly suggests that the Court *would* have accepted limits on contributions to political parties as a narrower (and therefore presumably constitutional) solution to the danger of circumvention of individual contribution limits. *See* 533 U.S. at 464–65, 121 S.Ct. 2351 ("The choice is between limiting contributions [to political parties] and limiting expenditures whose special value as expenditures is also the source of their power to corrupt. Congress is entitled to its choice.").

If there is a danger or a perceived danger that large contributions to political parties will circumvent direct limitations and influence candidates because candidates are obligated to their parties, then candidates may become obligated to large party donors whether or not those donations *directly* benefit them. If there is a danger or perceived danger that *the parties themselves* will deliver influence or access in exchange for money, then Alaska cannot be required to regulate only some

of that money, and therefore only some of the danger.

### b) *Amount of the Limit*

A contribution limit level will be accepted unless it is "so radical in effect as to render political association ineffective, drive the sound of a candidate's voice below the level of notice, and render contributions pointless." *Nixon*, 528 U.S. at 397, 120 S.Ct. 897; *see also Buckley*, 424 U.S. at 30, 96 S.Ct. 612 ("[I]f it is satisfied that some limit on contributions is necessary, a court has no scalpel to probe, whether, say, a $2,000 ceiling might not serve as well as $1,000."). In *Buckley*, the Supreme Court approved the limits established by FECA: a $1,000 individual contribution limit and a $5,000 political committee contribution limit. As the Alaska Supreme Court affirmed, Alaska's $5,000 individual contribution limit to political parties is well within these limits. *See AkCLU*, 978 P.2d at 624–25.

### 5) Additional Considerations

Amicus Republican National Committee ("RNC") argues strenuously that the constitutionality of political party donation limits depends upon how the donated funds are used. The basis of this claim is the theory that *Buckley* established "an express advocacy test" that only allows contributions to be limited where they will be used for speech advocating the election or defeat of a candidate. *See Buckley*, 424 U.S. at 44 & n. 52, 96 S.Ct. 612. In accepting this argument, the district court

cited the Washington Supreme Court's decision in *Washington State Republican Party v. Washington State Public Disclosure Commission*, which is one of the few cases published to date to address the constitutionality of limitations on soft money contributions.[27] 141 Wash.2d 245, 4 P.3d 808, 819–24 (2000) (en banc). In *Washington State*, the court concluded that contributions to political parties for purposes of issue advocacy could *not* be regulated, declaring that *Buckley* established that "issue advocacy is beyond the reach of government regulation."[28] 4 P.3d at 819; *see also Faucher v. FEC*, 928 F.2d 468, 472 (1st Cir.1991) (noting in the course of considering regulation of expenditures that *Buckley* "limit[ed] the scope of the FECA to express advocacy"); *Maine Right To Life Comm. v. FEC*, 914 F.Supp. 8, 10–12 (D.Maine) (same), *aff'd by* 98 F.3d 1 (1st Cir.1996); *West Virginians For Life, Inc. v. Smith*, 960 F.Supp. 1036, 1039 (S.D.W.Va.1996) (stating in the context of reporting requirements that "[i]t is clear from the holdings in *Buckley* and its progeny that the Supreme Court has made a definite distinction between express advocacy, which generally can be regulated, and issue advocacy, which generally cannot be regulated.").

This seriously flawed interpretation reflects a basic misreading of *Buckley*. *Buckley* distinguished between express advocacy and issue advocacy in order to avoid *unconstitutional vagueness* that might chill protected speech, not to estab-

---

**27.** As noted above, a three-judge panel of the District Court for the District of Columbia recently ruled on this issue in *McConnell v. FEC*, No. 02–582, slip op. Unfortunately, because the panel was unable to reach consensus, their analysis is of limited aid only.

**28.** The Washington Supreme Court also concluded that the corruption rationale does not apply to limits on contributions to political parties, distinguishing caselaw involving con-

tributions that were "essentially conduits for contributions to candidates, and thus ... pose the same threat of corruption as direct contributions." 4 P.3d at 825. This cursory determination is seriously undermined by *Colorado Republican II*, which was issued after *Washington State* and, as discussed above, concluded that a primary function of political parties is to act as a conduit for contributions to candidates.

lish a constitutional limit on the legislative ability to regulate issue advocacy. *Compare Buckley*, 424 U.S. at 44, 96 S.Ct. 612 ("We agree that in order to preserve the provision against invalidation on vagueness grounds, [it] must be construed to apply only to expenditures for communications that in express terms advocate the election or defeat of a clearly identified candidate for federal office.") *with Washington State*, 4 P.3d at 816 ("[*Buckley's* ] narrowing construction was necessary because if the limitations applied to issue advocacy, then FECA would unconstitutionally restrict such speech.").[29] The fact that *Buckley* went on to conclude that the provision was unconstitutional, even after excluding issue advocacy from its reach, provides further proof that the narrowing construction did not constitute a determination that restrictions on issue advocacy were per se unconstitutional. *See* 424 U.S. at 44, 96 S.Ct. 612 ("We then turn to the basic First Amendment question whether[the provision], even as thus narrowly and explicitly construed, impermissibly burdens the constitutional right of free expression."). Thus, *Buckley* did not establish that regu-

lation of issue advocacy was unconstitutional.

Additionally, the express advocacy test erected by the Court in *Buckley* related only to expenditures and reporting requirements, *not* to contributions.[30] *Id.* at 44, 78–80, 96 S.Ct. 612. Indeed, in considering parallel provisions, identically worded, in the definitions of contribution and expenditure,[31] the Court construed the terms differently, reserving the express advocacy test for the regulation of *expenditures*, while interpreting the regulated *contributions* more expansively, to include donations "made directly or indirectly to a candidate, political party, or campaign committee, . . . made to other organizations or individuals but earmarked for political purposes[, and] also all [coordinated] expenditures." *Id.* at 78, 96 S.Ct. 612. By construing the restrictions on contributions more broadly than restrictions on expenditures, thus allowing restrictions on contributions destined for issue advocacy, the Court implicitly dismissed the RNC's argument.

**29.** *See also California Pro–Life Council, Inc. v. Getman*, 328 F.3d 1088, 1096–97 (9th Cir. 2003) (looking to the distinction drawn in *Buckley* between express advocacy and other communications to aid in the consideration of whether a California statute's reporting requirement was *unconstitutionally vague* ); *McConnell*, slip op. by Kollar–Kotelly, J., at 373 (expressing the opinion of the court); *id.*, slip op. by Leon, J., at 51; *but see id.*, slip op. by Henderson, J., at 208–11.

**30.** Ironically, the Washington Supreme Court criticized the Washington State Public Disclosure Commission for "focus[ing] almost entirely on the distinction between contributions and expenditures delineated in *Buckley* without regard to the nature of the political speech involved." *Washington State*, 4 P.3d at 824. The court's unwillingness to address this distinction resulted in its conflation of expenditure limits and contribution limits, the fundamental distinction undergirding the Su-

preme Court's analysis of campaign finance regulation from *Buckley* to *Colorado Republican II. Compare, e.g., Washington State*, 4 P.3d at 824 (stating without analysis that contribution limits, if applied to issue advocacy, [ ] impose limitations on expenditures for issue advocacy—exactly what *Buckley* forecloses), *with Buckley*, 424 U.S. at 21–22, 96 S.Ct. 612 ("The overall effect of [FECA's] contribution ceilings is merely to require candidates and political committees to raise funds from a greater number of persons and to compel people who would otherwise contribute amounts greater than the statutory limits to expend such funds on direct political expression . . . .").

**31.** The regulation of both contributions and expenditures is limited to "[gifts of anything of value] made for the purpose of . . . influencing the nomination for election, or the election, of any person to Federal office." FECA §§ 431(e) & (f).

Moreover, in *California Medical Association*, in the course of upholding a provision of FECA that limited contributions from individuals and associations to multi-candidate political committees, the Court rejected the notion that the ultimate use or purpose of a contribution circumscribes the ability to restrict it. 453 U.S. at 199, 101 S.Ct. 2712. The appellants had asked the Court to declare the provision "unconstitutional to the extent that it restricts CMA's [California Medical Association] right to contribute administrative support to CALPAC," claiming that "because these contributions are earmarked for administrative support, they lack any potential for corrupting the political process." *Id.* at 198 n. 19, 101 S.Ct. 2712. In dismissing this argument, the Court highlighted two concerns.

First, it noted that "[i]f unlimited contributions for administrative support are permissible, individuals and groups like CMA could completely dominate the operations and contribution policies of independent political committees such as CALPAC." *Id.* Thus, "the individual or group that finances the committee's operations" might affect the election to a degree "far greater than [he or she] would be able to do acting alone." *Id.*

Secondly, the Court emphasized the likelihood that fancy bookkeeping and transfers would lead donations "for administrative support" ultimately to increase the money available for the support of candidates, and hinted that such an exception would corrode the rationale behind allowing PACs (and parties) to contribute larger amounts of money than individuals by eroding the representative nature of these organizations:

> if an individual or association was [sic] permitted to fund the entire operation of a political committee, all moneys solicited by that committee could be converted into contributions, the use of which

might well be dictated by the committee's main supporter. In this manner, political committees would be able to influence the electoral process to an extent disproportionate to their public support.

*Id.; see also Beaumont,* —— U.S. at ——, 123 S.Ct. at 2207 ("To the degree that a corporation could contribute to political candidates, the individuals 'who created it, who own it, or whom it employs,' could exceed the bounds imposed on their own contributions by diverting money through the corporation." (citations omitted)); *Buckley,* 424 U.S. at 56, 96 S.Ct. 612 (noting that contribution limits help ensure that a candidate's resources "vary with the size and intensity of the candidate's support"). In the wake of *Colorado Republican II,* the applicability of these concerns to contributions to political parties is clear. We reject the notion that the purpose of a contribution to a party limits Alaska's ability to regulate it.

Jacobus also relies on cases holding that it is unconstitutional to restrict the amount of money an individual can donate to a PAC organized to advocate in favor of or against a ballot initiative. However, these cases themselves emphasize that ballot initiatives differ from candidate elections, because the fear of corruption and the appearance of corruption that constitutes a sufficient governmental interest in the context of candidate elections is not present. *See, e.g., Citizens Against Rent Control/Coalition for Fair Housing v. City of Berkeley,* 454 U.S. 290, 301, 102 S.Ct. 434, 70 L.Ed.2d 492 (1981) ("In *Buckley,* this Court upheld limitations on contributions to candidates as necessary to prevent contributors from corrupting the representatives to whom the people have delegated political decisions. But curtailment of speech and association in a ballot measure campaign, where the people themselves render the ultimate political decision, can-

not be justified on this basis.") (Blackmun and O'Connor, concurring); *First Nat'l Bank of Boston v. Bellotti,* 435 U.S. 765, 790, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978) ("The risk of corruption perceived in cases involving candidate elections simply is not present in a popular vote on a public issue.") (citation omitted); *C & C Plywood Corp. v. Hanson,* 583 F.2d 421, 425 (9th Cir.1978) (stating that "[w]hen corporations seek to influence the electorate and not an individual candidate or *party,*" the state interest in preventing corruption of officials is not present) (emphasis added).

Contributions to an initiative advocacy committee do not create beholden candidates, except perhaps in the most attenuated fashion. Such contributions are designed to "persuade the electorate" rather than to influence the committee itself, and an individual or corporation contributing to a campaign for or against a ballot initiative cannot receive subsequent political favors as a consequence. While the public may object to the disproportionate influence on electoral outcomes of corporate advertising or large individual donations to ballot initiative committees, such objections simply do not reflect a danger of corruption or the appearance of corruption. *See, e.g., Bellotti,* 435 U.S. at 789, 98 S.Ct. 1407 ("According to appellee, corporations are wealthy and powerful and their views may drown out other points of view. If appellee's arguments were supported by record or legislative findings ... these arguments

would merit our consideration."). In contrast, the danger of corruption is always implicated by contributions to political parties because of the possibility that political parties and candidates will be coopted by special interests that are unrepresentative of their constituents.

In sum, we reject the additional arguments advanced by Jacobus and the RNC.

## C. CONSTITUTIONALITY OF BAN ON CORPORATE SOFT MONEY CONTRIBUTIONS

■ We have concluded that the limitations on individuals' soft money contributions to political parties are constitutional. The issue of the constitutionality of the Act's restriction on *corporate* soft money contributions presents a somewhat different question, however, because it involves a *ban* on contributions to political parties, rather than simply a limitation.[32] Nonetheless, the Supreme Court's teachings lead us to conclude that the soft money ban on corporate contributions is constitutional.

A *prohibition* on contributions presents a considerably more severe First Amendment burden than that occasioned by a *limitation* alone. As *Buckley* held, a limitation on contributions, while burdening First Amendment rights, allows both the symbolic expression of support and the ability to associate with a candidate or party. 424 U.S. at 20, 22, 96 S.Ct. 612. In contrast, a *ban* on contributions prevents the realization of either of these First Amendment interests through the medium of contributions.[33] *See AkCLU,* 978 P.2d

---

**32.** We note that the Act has been amended to provide an exception to the ban on corporate contributions and expenditures along the lines discussed by the Supreme Court in *Massachusetts Citizens for Life,* 479 U.S. at 264, 107 S.Ct. 616. 2002 Alaska Sess. Laws 1 § 12 provides:

"[N]ongroup entity" means a person, other than an individual, that takes action the major purpose of which is to influence the outcome of an election, and that

(A) cannot participate in business activities;
(B) does not have shareholders who have a claim on corporate earnings; and
(C) is independent from the influence of business corporations."

**33.** As discussed above, an absolute ban on all contributions might implicate the speech rights of a *donee* by "driv[ing] the sound of the candidate's voice below the level of notice." *Nixon,* 528 U.S. at 397, 120 S.Ct. 897. The rights of donees are not implicated here,

at 613 (upholding the "outright ban on contributions" although it "directly implicates both political speech rights and associational rights of would-be contributors"). Other circuits, addressing the question before us, have concluded that bans on corporate contributions are constitutional. *See, e.g., Mariani,* 212 F.3d at 764, 773–75 (3d Cir.2000) (en banc) (upholding FECA's ban on corporate contributions while acknowledging that an "avalanche of soft money" has undermined ban to some extent); *Kentucky Right to Life v. Terry,* 108 F.3d 637, 645–46 (6th Cir.1997); *Athens Lumber Co. v. FEC,* 718 F.2d 363 (11th Cir.1983) (en banc). In so holding, these circuits relied upon the Supreme Court's recognition that "the special characteristics of the corporate structure require particularly careful regulation." *Nat'l Right to Work Comm.,* 459 U.S. at 209–10, 103 S.Ct. 552.

 Corporations have rights under the First Amendment. *Austin,* 494 U.S. at 657, 110 S.Ct. 1391. However, as the Court has recently noted, "[w]ithin the realm of contributions generally, corporate contributions are furthest from the core of political expression, since corporations' First Amendment speech and association interests are derived largely from those of their members and of the public in receiving information." *Beaumont,* —— U.S. at —— n. 8, 123 S.Ct. at 2210 n. 8 (citations omitted). As a result, the power of the state to regulate corporate participation in elections is well established. *See Mass. Citizens for Life,* 479 U.S. at 252, 256–60, 107 S.Ct. 616; *Buckley,* 424 U.S. at 25–29, 96 S.Ct. 612; *AkCLU,* 978 P.2d at 614, 634. The breadth of this power was confirmed in *Austin,* when the Supreme

Court upheld a Michigan ban on *independent expenditures* from corporations' general treasuries, finding that the ban withstood strict scrutiny despite the fact that expenditures are protected more rigorously than contributions. 494 U.S. at 660, 110 S.Ct. 1391; *see also Beaumont,* —— U.S. at ——, 123 S.Ct. at 2205 (noting "the current of a century of congressional efforts to curb corporations' potentially 'deleterious influences on federal elections' "). The Court found that restricting "the corrosive and distorting effects of immense aggregations of wealth" on the political process constituted a compelling governmental interest, providing a rationale for state regulation of corporate political speech separate from the ordinary danger of corruption:

> Regardless of whether this danger of "financial *quid pro quo* " corruption may be sufficient to justify a restriction on independent expenditures, Michigan's regulation aims at a different type of corruption in the political arena: the corrosive and distorting effects of immense aggregations of wealth that are accumulated with the help of the corporate form and that have little or no correlation to the public's support for the corporation's political ideas.

*Austin,* 494 U.S. at 659, 110 S.Ct. 1391 (citation omitted). This rationale encompasses not only corporate money contributed directly to candidates, but any corporate political speech that could distort "the integrity of the marketplace of political ideas." *Mass. Citizens for Life,* 479 U.S. at 257, 107 S.Ct. 616. Despite the broad sweep of the ban on corporate expenditures in *Austin,* the Court found the ban to be justified, 494 U.S. at 661, 110 S.Ct.

---

however, because only contributions by corporations are banned; a prohibition on funding from this one source will not "prevent[ ] candidates and political committees from amassing the resources necessary for effective

advocacy" because this restriction merely requires donees "to raise funds from a greater number of persons." *Buckley,* 424 U.S. at 21–22, 96 S.Ct. 612.

1391, suggesting that a ban on corporate contributions is almost certainly also constitutional.

In this case, the ban on corporate soft money contributions to political parties is justified by both the danger of corruption and the corrosive effects of wealth accumulated with the aid of the corporate structure. Because the prohibition here is only on contributions, rather than on expenditures, it comprises less of a constitutional burden than the prohibition upheld in *Austin. See Austin*, 494 U.S. at 660, 110 S.Ct. 1391 ("Corporate wealth can unfairly influence elections when it is deployed in the form of independent expenditures, *just as it can when it assumes the guise of political contributions*." (emphasis added)). "A ban on direct corporate contributions leaves individual members of corporations free to make their own contributions, and deprives the public of little or no material information." *Beaumont*, ——— U.S. at ——— n. 8, 123 S.Ct. at 2210 n. 8. We hold that the ban passes constitutional scrutiny.

## IV.

### LIMITS ON VOLUNTEER PROFESSIONAL SERVICES

 Although, for the reasons discussed in the preceding section, we affirm Alaska's $5,000 limit on individuals' contributions to political parties as a general matter, we agree with Jacobus that Alaska may not constitutionally regulate volunteer legal services as contributions that fall within the $5,000 individual limit. We therefore affirm the district court's ruling that the inclusion of volunteer professional services in the Act's former definition of what constituted a "contribution" violated the First Amendment.[34]

34. Because we affirm this aspect of the district court's ruling on this basis, we do not reach the other grounds that Jacobus raises—

### A. FIRST AMENDMENT RIGHTS AND LIMITATIONS ON VOLUNTEERING SERVICES

 The First Amendment's protection of freedom of expression and association includes the right to volunteer services. *See Barker v. State of Wis. Ethics Bd.*, 841 F.Supp. 255, 258 (W.D.Wis.1993); *Soto v. State (In re Soto )*, 236 N.J.Super. 303, 565 A.2d 1088, 1094 (N.J.Super.Ct.App.Div.1989) ("[O]ur system of government is predicated upon the premise that every citizen shall have the right to engage in political activity."); *cf. United States Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers*, 413 U.S. 548, 564, 567, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973). In fact, in *Buckley* the Court justified the regulation of donors' monetary contributions by pointing to the fact that the ability to "actively associate through volunteering their services" was an avenue of political association left open to potential donors. 424 U.S. at 28, 96 S.Ct. 612; *accord Nixon*, 528 U.S. at 396 n. 7, 120 S.Ct. 897. Nonetheless, despite the value placed on volunteering, "[n]either the right to associate nor the right to participate in political activities is absolute." *Letter Carriers*, 413 U.S. at 567, 93 S.Ct. 2880.

The speech and association interests of both donor and donee are more substantially implicated by restrictions on contributions of volunteer services than by monetary contribution limits. *Cf. Barker*, 841 F.Supp. at 262 (stating that "the ability to contribute money to campaigns" is not equivalent to "the right to associate in person with campaigns"). An individual's investment of his or her time, energy, creativity, and passion to support a political campaign is at the heart of the association protected by the First Amendment. And, whereas the expressive value of mon-

vagueness, equal protection, and unconstitutional interference with internal party affairs.

etary contributions "rests solely on the undifferentiated, symbolic act of contributing," *Buckley,* 424 U.S. at 21, 96 S.Ct. 612, the transformation of contributions of volunteer services into political debate may involve the contributor's own speech.[35]

In *Soto,* in the course of upholding a restriction on the provision of professional services by casino "key employees," the New Jersey state appellate court reasoned that professional services, unlike other volunteer services, are fungible, and that limits on them are therefore identical to limits on monetary contributions:

> An attorney's services are not valued based on the personal ideological beliefs of the attorney but rather on the legal expertise and professional advocacy skills which he or she possesses. Professional legal services, provided [gratis] by a committee member who is an attorney, can readily be replaced, at a price, by the professional services of another attorney.

565 A.2d at 1101 (adopting ruling by Casino Control Commission). The *Soto* court's logic is unconvincing. *Buckley* held that in the context of monetary contributions "the overall effect of the Act's contribution ceilings is merely to require candidates and political committees to raise funds from a greater number of persons." 424 U.S. at 21–22, 96 S.Ct. 612. But donees affected by volunteer limits cannot simply obtain more donations and be as well off as they would have been in the absence of the limits. Not only do the skills, enthusiasm,

and efficacy of one volunteer differ from those of another, but there are unavoidable costs to splitting the provision of professional services between multiple donors.

Clearly, a complete prohibition on an individual's ability to volunteer services would constitute a severe encroachment upon that individual's First Amendment rights, and would require the weightiest of justifications in order to survive constitutional scrutiny. *See, e.g., Letter Carriers,* 413 U.S. at 556, 564–67, 93 S.Ct. 2880 (holding the prohibition on federal employees' participation in political campaigns to be justified by the government's interests, absent as to the citizenry in general, in averting the transformation of the large federal workforce into a "powerful, invincible, and perhaps corrupt political machine" as well as avoiding the danger of favoritism by government employees). But an absolute prohibition on volunteer services was not present under Alaska's former provision. Two aspects of the provision blunted its impact on the rights of association and expression. First, the Act limited only professional services. Although Jacobus showed some confusion on this point in his briefing, the notion that professionals were free to volunteer unlimited nonprofessional services was supported by the language of the statute and the position taken by Alaska in this litigation. *See, e.g., Reporting of Legal Services to a Party,* APOC Advisory Opinion A097–10–CD (June 3, 1997) (issued in response to a request by Jacobus).[36] Secondly, even

---

**35.** For example, when a volunteer goes door to door or makes phone calls to persuade voters to support a candidate, it is his or her own speech that is involved. In contrast, other volunteer services such as stuffing envelopes may function more like monetary contributions, facilitating the speech of another.

**36.** This advisory opinion stated:

> Both you and the other attorneys who serve as State Chairman, Republican National Committeeman, and district chairperson are free to volunteer your assistance on Party matters as long as your participation does not involve the provision of legal services for which you would ordinarily be paid. For example, you and the other officials who are attorneys may contribute your time organizing a fund-raiser or discussing general Party election strategy.

with regard to professional services, volunteering was not prohibited, but merely limited. Lawyers were free to volunteer legal services worth up to $5,000. Alternatively, they could donate legal services valued at a lesser amount in conjunction with a monetary donation, as long as the sum of the two contributions did not exceed $5,000. These factors distinguished Alaska's Act from the statute invalidated in *Barker*, which banned lobbyists from volunteering any type of services for political campaigns.[37] 841 F.Supp. at 257.

Thus, we must consider whether the burden on First Amendment rights imposed by preventing individuals from donating more than $5,000 worth of professional services can be sustained under the standard of scrutiny applied to contribution limits: whether the "regulation was 'closely drawn' to match a 'sufficiently important interest.'" *Nixon*, 528 U.S. at 387–88, 120 S.Ct. 897 (quoting *Buckley*, 424 U.S. at 25).

Alaska claims that the restriction on volunteer professional services was justified by the governmental interest in avoiding corruption and the appearance of corruption, because otherwise contribution limits could be circumvented. This position receives inadvertent support from Jacobus, who, in the course of emphasizing the extent of this provision's interference with his volunteer work for the Republican Par-

ty, declared that he contributed legal services worth between $43,000 and $82,000 each year between 1997 and 2000.[38] Volunteer services are by nature self-limiting. However, in the context of professional services, they are capable of amounting to significant quantities of money, thus triggering Alaska's underlying concern regarding the corrupting influence of large contributions. *Buckley*, 424 U.S. at 26–27, 96 S.Ct. 612.

Although the *Soto* court overstated its case when it claimed that there is "no distinction" between contributions of professional services and monetary contributions, it was quite right in noting that in terms of the financial benefit to the donee, "providing money to a political organization to pay for the professional services of an attorney" is virtually indistinguishable from "providing professional legal services directly without requiring payment for them."[39] 565 A.2d at 1101 (alterations omitted). It is possible that if Alaska is not permitted to regulate these contributions, professionals who possess skills desired by political parties or candidates could exceed contribution limits significantly. However, Alaska has provided no reason in this case to believe that there is an actual danger of corruption or its appearance if contributions of professional volunteer services go unrestricted. Because the mechanism for corruption as-

---

**37.** Moreover, unlike in *Barker* and *Soto*, Alaska's statute did not single out members of a particular profession for disfavored treatment. Rather, Alaska's statute was aimed at removing an advantage that professionals have due to the disproportionate value of the services that they are able to volunteer.

**38.** This statement appeared in Jacobus's opening brief before this court. Jacobus stated that due to their volunteer activities, "[b]oth Mr. Jacobus and Mr. Kohlhaas exceeded the limitations, Mr. Jacobus by a very substantial amount," and then noted, "Mr. Jacobus's APOC reports list personal contri-

butions to the RPA of $61,972.37 for 1997, $82,050.00 for 1998, $50,836.00 for 1999, and $43,410.00 for 2000 through November 30." These sums may have included monetary contributions, but appear to principally represent the value of contributions of professional services.

**39.** Note that the sufficiently important government interest that the *Soto* court recognized differed from the circumvention rationale that Alaska advances here. In *Soto*, New Jersey sought to limit the corrupting influence of the gambling industry on the political process. 565 A.2d at 1096–98.

serted here is fairly novel, "the quantum of empirical evidence needed to satisfy heightened judicial scrutiny" is somewhat greater. *Nixon,* 528 U.S. at 391, 120 S.Ct. 897. The severe burden on quintessential First Amendment activity involved here cannot stand without some indication that a serious evil may occur in its absence.

## B. CORPORATE DONATIONS OF PROFESSIONAL SERVICES

■ Our holding regarding the unconstitutionality of limits on individuals' donations of professional services should not be read to invalidate limitations on corporate donations of professional services, restrictions that remain unaltered by the aforementioned amendments to the Act. In the context of corporate donations, none of the distinctions between monetary donations and in-kind donations discussed above apply, because corporations have no services of their own to volunteer, but merely buy services from their employees. Jacobus admits in his briefs that if a third-party paid for a professional's time, that act would constitute a donation under Alaska law.[40] Because one of the key objectives of the corporate contribution ban is to prevent corporations from unfairly benefitting from the state-created advantages of the corporate form, *see, e.g., Austin,* 494 U.S. at 659, 110 S.Ct. 1391, the Act's ban on the provision of volunteer services by corporations stands.

## V.

### CONCLUSION

For the reasons set forth above, we REVERSE the district court's ruling that section 15.13.074(f), former section 15.13.070(b)(2), and former section 15.13.400(3)[41] of the Alaska Statutes are unconstitutional as applied to "soft money" contributions. We uphold these sections as they apply to all contributions, whether or not such contributions are explicitly intended to influence the nomination or election of a candidate. However, we AFFIRM the district court's rulings holding unconstitutional the provision in former section 15.13.400(3)(B)(i) of the Alaska Statutes to the extent that it limited the volunteering of professional services by individuals.

Each side to bear their own costs on appeal.

**AFFIRMED** in part and **REVERSED** in part.

---

40. This is so even in a case such as this one, where the corporate plaintiffs are wholly owned by individual professionals.

41. As noted supra, this section has been relocated to section 15.13.400(4). As also noted, the district court appears to have mistakenly referred to the nonexistent section 15.30.400.